IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>  Plaintiff,<br><br>vs.<br><br>ERIKA MELISSA CASTRO-RIOS,<br><br>  Defendant. | CR 10-00454-TUC-FRZ (GEE)<br><br>**REPORT AND RECOMMENDATION** |

The District Court referred this case to the magistrate for hearing on pretrial matters. Hearing on Defendant's Motion to Suppress was held on January 31, 2011. Upon consideration of the evidence presented and the arguments of respective counsel, the magistrate recommends the District Court, after its de novo review, DENY the Motion to Suppress.

**CHARGE:**

The two-count indictment charges that on or about February 6, 2010, near Sonoita, the defendant possessed, and conspired to possess, with intent to distribute approximately 138 kilograms of marijuana. (It should be noted there was a co-defendant named in the indictment; however, the indictment as to that individual was dismissed on December 10, 2010.)

1  **MOTION TO SUPPRESS:**

2     Defendant argues all evidence against her should be suppressed because the Border Patrol
3  agent lacked reasonable suspicion to stop her vehicle; she also argues her statements should
4  be suppressed because they were not voluntarily made.

5  *Testimony of Logan Wolf (BPA)*

6     Wolf has been assigned to the Sonoita Border Patrol station for about a year and a half.
7  He stated his patrol area is "very rural, mostly dirt roads, very few houses in the area, very
8  low population", and it is an area known for drug and illegal alien smuggling activities. On
9  February 6, 2010, his patrol area was within three miles of the Mexican border. He testified
10 there are a few ranches in that area and he knows the ranchers and their vehicles. He was
11 driving southbound on Forest Service Road (FSR) 69 when he saw a silver pickup truck
12 approaching him from the south. He slowed down and after the truck passed him, he (Wolf)
13 turned around to follow the truck for further investigation. This happened in the afternoon,
14 "right around shift change." The time was significant because that is usually when fewer
15 agents are in the area and contraband smuggling increases during that time. Wolf testified
16 he did not recognize the truck, and the driver and passenger sat very rigid and, unlike the
17 local residents, in no way acknowledged his presence.

18    As Wolf turned around to follow the truck the driver seemed to accelerate and a green
19 SUV pulled in front of Wolf and appeared to be blocking him from further investigation of
20 the silver truck. Wolf testified he did not recognize the SUV as being a local vehicle, and
21 that it pulled in front of him from a dirt side road. The SUV slowed down and started
22 swerving back and forth in front of Wolf. Wolf stated FSR 61 is a fairly narrow two lane
23 road. Wolf testified that from his experience he believed the SUV was a "heat" or "decoy"
24 vehicle, i.e., a vehicle used to distract law enforcement from another vehicle which is loaded
25 with contraband. Finding it impossible to get around the SUV, Wolf radioed for assistance
26 and described what was going on; he asked for someone to pursue the silver truck while he
27 followed the SUV. BPA Ramirez, who was proceeding on FSR 49 to Wolf's location,
28 responded that he had passed the green SUV but had not yet seen a silver truck. Wolf and

1  Ramirez encountered each other where FSR 61 and FSR 49 intersect. Since Ramirez had not
2  seen the silver truck on FSR 49, Wolf assumed it was continuing northbound on FSR 61.
3  Wolf proceeded to follow the SUV on FSR 49 and Ramirez proceeded to locate the silver
4  truck by continuing on FSR 61.

5  During cross-examination Wolf testified that while it is not unusual to see vehicles in the
6  area he was patrolling on February 6th, his awareness is raised when he encounters an
7  unfamiliar vehicle in the area. He also stated that FSR 61 is a dirt road and there are no lines
8  delineating the two lanes. Wolf admitted there was dust coming from the road and he could
9  not be sure if the SUV was, in fact, just trying to pass the silver truck.

10

11 *Testimony of Martin Ramirez (BPA)*

12  Ramirez stated he has been assigned to the Sonoita area for more than five years. On
13  February 6, 2010, he was assigned to patrol the western most part of the area which is close
14  to the Mexican border. The only road from the border is FSR 61 which at some point
15  connects with FSR 49. Both those roads are narrow, bumpy, two lane dirt roads. At its
16  southern most point FSR 61 parallels, and is only about 100 yards from, the border. Ramirez
17  testified there are only a few ranches in the area and he is familiar with the vehicles driven by
18  the local residents.

19  At about 3 p.m. on February 6th Ramirez was southbound when he heard Wolf's radio
20  request for assistance. Ramirez stated the time was significant to him because it was during
21  shift change which is a time there is usually increased smuggling activity. He also thought
22  is was significant when Wolf radioed that a green Tahoe was blocking his pursuit of a gray
23  truck on FSR 61; he thought it might be a heat or decoy vehicle which is a known tactic used
24  by smugglers. He responded that he was heading south on FSR 49 to Wolf's location and
25  would attempt to locate the gray truck. Ramirez passed the green Tahoe and saw Wolf right
26  behind it. Ramirez advised Wolf he had not passed the gray truck, and therefore assumed the
27  truck had proceeded west on FSR 61 which "makes a sharp incline up above" where the two
28  agents were stopped. Ramirez testified he "could clearly see a dust cloud and a gray truck ,

1  driving off in the distance." Wolf then proceeded to follow the green Tahoe on FSR 49 and
2  Ramirez proceeded to pursue and investigate the gray truck westbound on FSR 61. He
3  reached the top of a hill and was able to look down and saw the gray truck traveling at a high
4  rate of speed on FSR 61. Ramirez admitted there is no posted speed on the road; however,
5  he has driven that road a lot and that more than 25 mph is "very dangerous" because there are
6  very sharp blind turns and the dirt road is bumpy. Ramirez testified that after two or three
7  miles he was about two car lengths behind the gray truck, and followed for about four miles
8  before activating his lights for the truck to stop. After he caught up with the gray truck but
9  before he activated his lights Ramirez noticed that the female driver and male passenger were
10 sitting rigid in their seats, and then the truck braked and slowed drastically to about 10 mph.
11 The driver of the truck was weaving over the road, and her attention was focused on the
12 rearview and driver side mirrors as though she was preoccupied with agent's presence. The
13 driver would step on her brakes, continue to move forward, and then again apply her brakes.
14 Ramirez testified that in his experience this type of driving often occurred just before
15 smugglers pulled their vehicles over and fled on foot.

16 Ramirez stated that while he was following the gray truck at 10 mph he ran a vehicle
17 registration on the truck's plates and learned the vehicle was registered to someone in Douglas
18 which is a town located about two hours from Sonoita. This information was significant to
19 Ramirez because recently there had been several drug seizures involving vehicles registered
20 "out of Douglas and the Sierra Vista area."

21 Ramirez activated his lights and the gray truck pulled over immediately. Ramirez exited
22 his service vehicle, approached the driver and asked her twice about her citizenship and got
23 no response. He then asked in Spanish and the passenger responded that the driver was a U.S.
24 citizen, after which the driver confirmed in Spanish she was a U.S. citizen. The passenger
25 stated he was a legal resident alien. When Ramirez asked the driver where they were coming
26 from the passenger answered they were "coming from the lake" but could not provide a name
27 of the lake. When asked where they were going the driver first said she was going to Nogales
28 to visit a friend, and then said she was going to an aunt in Nogales but could not provide an

- 4 -

1  address  During this questioning Ramirez noticed the driver's hands were on the steering
2  wheel and were "shaking uncontrollably." Ramirez then asked if there was anything illegal
3  in the vehicle and the driver said, "No." Ramirez testified he then asked the driver in Spanish
4  for consent to search and she answered in Spanish that he could look in the truck. The two
5  then complied with Ramirez's request that they exit the truck and step to the rear of the truck.
6  Ramirez opened the tailgate and saw a "fresh weld mark with fresh silver spray paint" in the
7  truck bed. He testified this was suspicious because in the past he has found narcotics hidden
8  in false compartments under truck beds.
9  Ramirez stated that after he further searched the vehicle and could find no visible
10 entryway into the truck bed he requested canine assistance to further inspect the truck. The
11 closest canine unit was at a BPA checkpoint on Interstate 19 and it took approximately 45
12 minutes for the dog to arrive at Ramirez's location. Ramirez testified that approximately 10
13 minutes elapsed between the time he initially stopped the gray truck and called for a canine
14 unit. Ramirez then asked the two suspects if they wanted to wait in his air-conditioned
15 vehicle until the dog arrived and they said, "Yes."
16 Upon the arrival of the canine unit Ramirez saw the dog go immediately to the gray truck
17 and focus mainly on the truck bed. After the handler advised the dog had alerted to an odor
18 he was trained to detect Ramirez went under the truck and found a compartment near the gas
19 tank. He found several holes large enough to stick a "pinky" into and was able to feel
20 cellophane wrapped bundles. He then inserted a knife and when pulled out the knife had
21 particles of "green leafy substance that smelled like marijuana."
22 He then went to his vehicle where the two suspects were sitting, advised them he had
23 located marijuana in the truck, and read the driver, defendant Rios, her *Miranda* rights
24 (written on a card he carried in his pocket) in Spanish. Rios said she understood the rights and
25 was willing to answer questions without an attorney present. The passenger was then read his
26 rights but requested a lawyer. Ramirez then asked Rios (who was then crying) if she knew
27 there was marijuana in the truck and she said, "No." Ramirez asked her no further questions.
28 On cross-examination, Ramirez admitted that because FSR 61 is a rocky, bumpy road with

1 lots of dips and curves, it would be important for a driver to be attentive to the road, and that
2 it would not be unusual for a person to drive in the middle of the road if there were no
3 oncoming traffic. He admitted he was in a clearly marked law enforcement vehicle, and that
4 it is not unusual for a driver to slow down when being followed by a law enforcement vehicle.
5 He also stated that during the time the truck was braking and proceeding slowly, neither the
6 passenger nor the driver door ever opened a door. He also admitted it is not unusual for a
7 person to be nervous during questioning by law enforcement.

### *Testimony of Jesus Irlas (BPA)*

Irlas testified that at about 6:30 p.m. on February 6, 2010, he noticed BPA Ramirez was still at the Sonoita station. Because he knew that Ramirez had been on duty since 8 a.m. that morning he offered to assist Ramirez in any way. Ramirez asked Irlas for help in interviewing a male and a female suspect he had arrested earlier. Irlas testified that Ramirez described events leading to the defendants' arrest and advised that *Miranda* warnings had been given in the field. Irlas stated he was present when *Miranda* warnings were read to Castro-Rios in Spanish at the station. He confirmed he signed the I-214 (*see* attached *Exhibit* 1) indicating he had witnessed the advisement of rights. Irlas testified that Castro-Rios signed the I-214 indicating she understood the rights and was willing to waive them and answer questions. Later Irlas questioned the defendant in Spanish and that interview was recorded. Irlas stated the defendant made incriminating statements and never stated she wanted to stop the interview and never asked for a lawyer.

During cross-examination Irlas stated the defendant appeared "nervous" and "a little distraught." when he first encountered her at the station. Irlas testified he did not begin the interview of the defendant until 12:22 a.m. and ended at 12:26 a.m. He stated that before he began the interview at 12:22 a.m. he reminded the defendant of her *Miranda* rights by reading the rights from the top of the I-214; she appeared calmer at that time. He stated he advised the defendant she was being processed and prosecuted for "contraband smuggling"; he denied discussing with her the penalties or any other ramifications she might be facing.

**DISCUSSION:**

*<u>Stop of the vehicle</u>*

The defendant argues: (1) there was insufficient basis for the stop of the defendant's vehicle; (2) the search of the defendant's vehicle was invalid; and (3) the defendant's statements were involuntary.

The search and seizure of a motorist suspected of criminal activity is analyzed according to the framework set out in *Terry v. Ohio*, 392 U.S. 1 (1968). For a lawful investigative stop the officer must have a "reasonable suspicion supported by articulable facts that criminal activity 'may be afoot'." *United States v. Sokolow*, 490 U.S.1, 7 (1989). In determining whether reasonable suspicion existed to justify an investigatory stop, a reviewing court is required to "look at the totality of the circumstances of each case to see whether the detaining officer ha[d] a particularized and objective basis for suspecting legal wrongdoing." *United States v. Arvizu,* 534 U.S. 266, 273 (2002) (internal punctuation deleted). "In the context of Border Patrol [stops], the factors to be considered in determining whether 'reasonable suspicion' exists to justify stopping a vehicle include, but are not limited to: (1)characteristics of the area; (2) proximity to the border; (3) usual patterns of traffic and time of day; (4) previous alien or drug smuggling in the area; (5) behavior of the driver...; (6) appearance or behavior of passengers; (7) model and appearance of the vehicle; and (8) officer experience. *United States v. Garcia-Barron,* 116 F.3d 1305, 1307 (9th Cir. 1997) (citing *United States v. Brignoni-Ponce,* 422 U.S. 873, 885 (1975).

In the present case Wolf testified that he began to follow the silver/gray truck driven by the defendant for the following reasons: (1) it was an unfamiliar vehicle in a rural area; (2) he first observed the silver truck about three miles from the Mexican border; (3) the occupants sat very rigid and, unlike local residents, did not acknowledge his presence in a marked vehicle; (4) it was shift change time; and (5) the green SUV came from a side road, got between him and the silver truck, and drove in such a manner as to prevent Wolf from catching up with the silver truck. After receiving this information from Wolf, agent Ramirez

1  took up the pursuit of the silver truck.  Ramirez  testified: (1) shift change is significant to
2  him; (2)  FSR 61 is very close to the border; (3)  he also believed the green SUV was decoy
3  or heat vehicle; (4)   the silver truck was traveling at an unsafe speed given the road
4  conditions; (5) the silver truck was unfamiliar to him in the area; (6) the truck's occupants sat
5  rigidly; (7) the silver truck was swerving on the road and the driver seemed more concerned
6  with the agent's presence behind her than with watching the road ahead; (8) at some point the
7  driver of the silver truck braked and drastically reduced speed several times; (9) the vehicle
8  was registered out of Douglas and there had recently been several drug seizures involving
9  vehicles registered from that area; and defendant's hands were trembling after he initially
10 stopped her.
11    In deciding whether the totality of the circumstances constitute a reasonable suspicion, it
12 is inappropriate to view each factor in insolation or to give no weight to factors for which an
13 innocent explanation may exist.  *United States v. Arvizu*, 534 U.S. 266, 274 (2002).
14 Individual factors that may appear innocent in isolation may constitute suspicious behavior
15 when aggregated together.  While no particular factor is controlling, and the totality of the
16 circumstances governs, the one vital element is that the agent must have had reason to believe
17 the suspect vehicle had come from the border.  Agent Wolf testified he first observed the
18 silver truck about three miles north of the Mexican border.
19    Considering the factors listed by Wolf and Ramirez, and analyzing them in the context of
20 the "totality of the circumstances" this court concludes agent Ramirez had reasonable
21 suspicion to conduct an investigative stop of the vehicle driven by the defendant.
22
23 ***Search of the vehicle***
24    The defendant spends a lot of time analyzing the search of the defendant's vehicle in the
25 context of the recent case of *Arizona v. Gant*, 129 S.Ct. 1710, 173 L.Ed. 2d 485
26 (U.S.Ariz.Apr.21, 2009), and its predecessors.  Those cases, however, are unavailing because
27 they all involved searches incident to an arrest.  In the present case Ramirez testified he did
28 not arrest the defendant until *after* he had discovered the marijuana.  Ramirez testified that

1  after stopping the defendant and asking a few questions he asked her if he could search the
2  truck and she gave her consent.  In searching the truck he saw a fresh weld mark with fresh
3  silver spray paint in the bed of the truck and this led him, from past experience, to believe
4  there was a compartment containing drugs.  Unable to find a way to access the compartment,
5  Ramirez requested assistance from a canine unit.  It was only after the dog arrived on the
6  scene and alerted that Ramirez went under the truck and located the marijuana.  He then went
7  to the truck's occupants, advised them of what he had found, arrested them, and read them
8  their *Miranda* rights.
9      The defendant does not challenge the fact that she consented to the search of the truck  nor
10 was there any evidence presented to suggest she was arrested before the marijuana was
11 located.  This court concludes that after the defendant consented to the search and the agent
12 found signs of what he believed was a hidden compartment he was justified in prolonging the
13 stop in order to further pursue his investigation.  There is no evidence the defendant was
14 arrested at that time.  Ramirez testified he gave the suspects the option of remaining standing
15 alongside the roadway or sitting in his air-conditioned service vehicle, and they chose to sit
16 in his vehicle.  Furthermore, there was no evidence that there was unnecessary delay in getting
17 the canine unit to the scene.

21 ***Voluntariness of defendant's statements***

23    The defendant's written Motion to Suppress challenges the voluntariness of her statements.
24 However, neither in that motion nor at the hearing does defense counsel point to any facts
25 which would support his claim. In fact, at the end of the hearing on January 31, 2011, defense
26 counsel argued the defendant's statements should be suppressed because they were the "fruit
27 of the poisonous tree." On the other hand, the controverted and credible testimony of agents
28 Ramirez and Irlas demonstrates that the defendant was properly advised of her *Miranda* rights

- 9 -

1  in Spanish on several occasions and stated her willingness to answer questions without the
2  presence of a lawyer. Nothing in the circumstances of the interviews suggests that her will was
3  overborn so as to render her statements involuntary.

## RECOMMENDATION:

In view of the foregoing, the magistrate recommends that the District Court, after its independent review of the record, **DENY** the defendant's Motions to Suppress. Any party may file objections within 14 days after being served with a copy of this Report and Recommendation. If objection are not timely filed, the party's right to de novo review may be waived. If objection are filed, the parties should direct them to the District Court by **omitting the magistrate's initials from the caption.**

This Report and Recommendation is being faxed to all counsel on today's date. The Clerk of the Court is directed to send a copy of this Report and Recommendation to all counsel.

DATED this 31st day of March, 2011.

_____
Glenda E. Edmonds
United States Magistrate Judge